**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 1:25-cv-20858-RAR**

**HERIBERTO VALIENTE,**

      **Plaintiff,**

**v.**

**BAPTIST HEALTH SOUTH FLORIDA, INC., and PALM BEACH CREDIT ADJUSTORS, INC. d/b/a KENDALL CREDIT AND BUSINESS SERVICE, INC.**

      **Defendants.**

_____/

**<u>MOTION TO DISMISS AMENDED COMPLAINT</u>**

Defendants, Baptist Health South Florida, Inc. ("Baptist") and Palm Beach Credit Adjustors, Inc. d/b/a Kendall Credit and Business Service, Inc. ("PBCA"), by and through their undersigned counsel and pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) and S.D. Fla. L.R. 7.1, move for entry of an order dismissing Plaintiff, Heriberto Valiente's, Amended Complaint [DE 13].

This is a typical lawyer-driven consumer collection case brought to recover a vastly greater amount of attorney fees than the damages sought for the plaintiff. The allegations are the type that only a sophisticated, imaginative lawyer could create. *See, e.g., Donaeva v. Client Servs., Inc.*, No. 18-C-1084, 2019 WL 3067108, at *4 (E.D. N.Y. July 12, 2019) ("Like many FDCPA cases, 'this is a 'lawyer's case,' by which I mean that it alleges a defect of which only a sophisticated lawyer, not the least sophisticated consumer, would conceive.'").[1] However, the Amended Complaint fails to allege a concrete injury sufficient to maintain Article III standing and, also, the allegations are exactly the type of tenuous and, in some cases, demonstrably false, interpretation of collection notices that courts seek to prevent in developing the "least sophisticated consumer" standard.

## PERTINENT ALLEGATIONS OF THE AMENDED COMPLAINT

On July 11, 2024, Plaintiff presented at Kendale Lakes Urgent Care for medical care and provided his insurance information. [DE 13 ¶¶ 8, 9, 10]. Plaintiff alleges his insurance provider (the "Insurer") paid $428.80 in full satisfaction of the charges. [*Id.* ¶¶ 11, 12]. Plaintiff alleges Baptist knew the account was paid in full yet sought to collect additional funds. [*Id.* ¶¶ 17-18]. On August 23, 2024, Baptist sent Plaintiff a bill which stated "[y]our insurance carrier has informed

---

[1]     *See also, Koehn v. Delta Outsource Grp., Inc.*, No. 18-C-1084, 2018 WL 6590617, at *3 (E.D. Wis. Dec. 14, 2018) ("an unsophisticated consumer is not a gifted linguist who closely parses a debt collection letter like a Wall Street lawyer analyzes a municipal bond offering or like a patent lawyer construes a patent.") (collecting cases), affirmed, 939 F. 3d 863 (7th Cir. 2019); *Gardner v. Weltman, Weinberg & Reis Co., LPA*, 414 F. Supp. 3d 708, 712 (E.D. Pa. 2019) ("cases have acknowledged lawyers' attempts to use the least sophisticated debtor standard to exploit the FDCPA through 'creative' litigation") (collecting cases).

us that the balance due is your responsibility. ... If you have any questions about your out-of-pocket expense, please contact your insurance provider so they can explain how your claim was processed. Your insurance provider determines benefit coverage, and any patient responsibility." [DE 13-2]. The bill also stated that Plaintiff's Insurer identified $643.20 as his out-of-pocket expense after applying the $428.80 insurance payment to the $1,072.00 total charges (the "643 Bill"). [*Id.*].

On October 14, 2024, PBCA sent Plaintiff a letter (the "First 643 Letter"), which stated:

**<u>How can you dispute the debt?</u>**
- Call or write to us by 11/18/2024, to dispute all or part of the debt. If you do not, we will assume that our information is correct.
- If you write to us by 11/18/2024, we must stop collection on any amount you dispute until we send you information that shows you owe the debt. You may use the form below or write to us without the form. You may also include supporting documents.

[DE 13 ¶¶ 40, 41; 13-5]. On November 25, 2024, PBCA sent Plaintiff another letter advising that he still owed the $643.20 out-of-pocket expense (the "Second 643 Letter"). [DE 13 ¶ 97; 13-7].

Plaintiff alleges that, on December 5, 2024, his attorney sent a letter to Kendall Credit and Business Service (a fictitious name owned by PBCA) ("KCBS") advising that he represented Plaintiff and disputed the $643.20 out-of-pocket expense (the "December Dispute Notice"). [DE 13 ¶ 111; 13-9]. On January 6, 2025, PBCA sent Plaintiff a letter advising that he still owed the $643.20 out-of-pocket expense (the "Third 643 Letter"). [DE 13 ¶ 66; 13-11].

On July 20, 2024, Plaintiff sought follow-up treatment and provided his insurance information. [DE 13 ¶¶ 13, 14]. Plaintiff alleges his Insurer paid $297.20 in full satisfaction of the charges. [*Id.* ¶¶ 15-16]. Plaintiff alleges Baptist knew the account was paid in full yet sought to collect additional funds. [*Id.* ¶¶ 17-18]. On August 22, 2024, Baptist sent Plaintiff a bill which stated "[y]our insurance carrier has informed us that the balance due is your responsibility. … If you have any questions about your out-of-pocket expense, please contact your insurance provider

so they can explain how your claim was processed. Your insurance provider determines benefit coverage, and any patient responsibility." [DE 13-1]. The bill further stated that his Insurer identified $445.80 as Plaintiff's out-of-pocket expense after applying the $297.20 insurance payment to the $743.00 total charges (the "445 Bill"). [DE 13 ¶ 19; 13-1]. On September 3, 2024, Baptist sent Plaintiff a Statement for the $445.80 out-of-pocket expense, stating: "If you have any questions about your out-of-pocket expense, please contact your insurance provider so that they can explain how your claim was processed. Your insurance provider determines benefit coverage and any patient financial responsibility" (the "Second 445 Bill"). [DE 13 ¶ 24; 13-3].

Plaintiff alleges that, on October 9, 2024, his attorney sent Baptist a letter advising that he represented Plaintiff and disputed the out-of-pocket expense (the "October Dispute Notice"). [DE 13 ¶ 26; 13-4]. Plaintiff alleges that "[d]ue to a regional weather delay, USPS was delayed in delivering the October Notice until approximately October 31, 2024." [DE 13 ¶ 27].

On October 14, 2024, PBCA sent Plaintiff a letter (the "First 445 Letter"), which stated:

**How can you dispute the debt?**
- Call or write to us by 11/18/2024, to dispute all or part of the debt. If you do not, we will assume that our information is correct.
- If you write to us by 11/18/2024, we must stop collection on any amount you dispute until we send you information that shows you owe the debt. You may use the form below or write to us without the form. You may also include supporting documents.

[DE 13 ¶ 48; 13-6]. On November 25, 2024, PBCA sent Plaintiff a letter stating that he still owed the $445.80 out-of-pocket expense (the "Second 445 Letter). [DE 13 ¶ 104; 13-8]. Plaintiff alleges the December Dispute Notice also disputed the $445.80 out-of-pocket expense. [DE 13 ¶ 111; 13-9]. On January 6, 2025, PBCA sent Plaintiff a letter advising that he still owed the $445.80 out-of-pocket expense (the "Third 445 Letter"). [DE 13 ¶ 120; 13-11].

## PROCEDURAL HISTORY

On January 20, 2025, despite being repeatedly informed that his Insurer - - not Baptist - - determined benefit coverage and any patient financial responsibility, Plaintiff sued KCBS for violation of Fla. Stat. §§ 559.72(18) and 559.72(9), in the Miami-Dade County Court, Case No. 2025-012672-cc-05, seeking $1,000 in statutory damages. On January 31, PBCA filed a Limited Notice of Appearance and Motion to Quash Service of Process. On February 24, Plaintiff filed a 107-paragraph Complaint in this Court, which was a confusing, "everything but the kitchen sink" shotgun pleading asserting five (5) causes of action against PBCA and two (2) against the newly added defendant, Baptist, and seeking $2,000 in statutory damages ($1,000 per defendant). [DE 1]. On February 25, Plaintiff dismissed the County Court case. On March 26, 2025, Baptist and PBCA filed a Motion to Dismiss Complaint. [DE 9]. On April 9, instead of responding to the Motion to Dismiss, Plaintiff filed the Amended Complaint, which, again, is a confusing, now 174-paragraph tome that asserts six (6) repetitive causes of action against PBCA, and two (2) against Baptist, and seeks $2,000 in statutory damages ($1,000 per defendant) and, of course, an award of attorneys' fees and costs. [DE 13]. As discussed in section III(F) below, Baptist and PBCA are separate legal entities, and Baptist is not a proper defendant in this case. Plaintiff does not seek to pierce the corporate veil or allege vicarious liability or any theory of agency.

## LEGAL ARGUMENT

### I.    STANDARDS OF REVIEW

Fed. R. Civ. P. 12(b)(1) permits a party to challenge subject matter jurisdiction. Pursuant to Fed. R. Civ. P. 12(b)(1), such a motion may present either a "facial" or a "factual" challenge. *See McElmurray v. Consol. Gov't*., 501 F. 3d 1244, 1251 (11th Cir. 2007). In a facial challenge, a court is required to determine if the plaintiff has "sufficiently alleged a basis for subject matter jurisdiction." *Id*. at 1251. Further, "the court must consider the allegations in the plaintiff's

complaint as true." *BIG League Ventures, LLC v. Certain Underwriters at Lloyd's, London*, 474 F. Supp. 3d 1279, 1281 (S.D. Fla. 2020) (citation omitted). By contrast, a factual attack "challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings ... are considered.'" *McElmurray*, 501 F. 3d at 1251 (citation omitted).

Additionally, "[d]ismissal is appropriate when a plaintiff fails to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint can only survive a 12(b)(6) motion if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A complaint is insufficient "if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557). Moreover, "when exhibits attached to a complaint 'contradict the general and conclusory allegations of the pleading, the exhibits govern.'" *Gill as Next Friend of K.C.R. v. Judd*, 941 F. 3d 504, 514 (11th Cir. 2019) (citations omitted).

## II.   PLAINTIFF DOES NOT HAVE STANDING

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The injury in fact must be both "(a) concrete and particularized, ... and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560. Tangible injuries, such as physical and monetary harms, readily qualify as concrete injuries under Article III. *Spokeo*, 578 U.S. at 340. Intangible injuries "sometimes qualify as concrete, but

not always." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F. 3d 990, 997 (11th Cir. 2020). And some concrete, intangible injuries may flow from statutory violations. *Spokeo*, 578 U.S. at 341. However, "a plaintiff does not 'automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.' … Rather, 'Article III standing requires a concrete injury even in the context of a statutory violation.'" *Trichell*, 964 F. 3d at 997 (quoting *Spokeo*, 578 U.S. at 341).

## A.   No Concrete Injury in Fact

Plaintiff offers conclusory allegations of injuries he allegedly sustained by receiving mail after he refused to pay his out-of-pocket expenses for medical treatment he received. But his formulaic recitations of harm fail to allege a concrete injury and Plaintiff does not have standing.

### *Confusion, Frustration and Anger*

Plaintiff alleges he was "confused, frustrated, upset and angry" upon receipt of the 445 and 643 Bills, and the 643, 445 and Second 445 Letters. [DE 13 ¶¶ 21, 23, 99, 100, 106, 107, 124, 125]. He alleges that his "stress, anxiety" and unidentified "subsequent injuries were directly caused by Defendants' repeated communications." [*Id.* ¶ 126]. These allegations are nothing more than insufficient "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Lattimore v. Wells Fargo Bank, N.A.*, 590 F. App'x 912, 913 (11th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). "[C]onfusion - - on its own - - is not an injury in fact." *Preisler v. Eastpoint Recovery Grp., Inc.*, No. 20-CV-62268-RAR, 2021 WL 2110794, at *4, 5-6 (S.D. Fla. May 25, 2021) (finding that plaintiff lacked Article III standing because his confusion, even with the addition of unsupported allegations that he suffered emotional distress, was insufficient to fabricate a concrete injury") (citation omitted). *See also Suazo v. Resurgent Cap. Servs. LP*, No. 21-24016-CIV-MARTINEZ, 2023 WL 6037421, at *5 (S.D. Fla. Sept. 15, 2023) (same) (collecting cases).

Likewise, conclusory statements regarding "stress, worry, anxiety, frustration, and anger" are not "sufficiently concrete and particularized to establish Article III standing." *Luce v. LVNV Funding LLC*, 21-CV-82143-RUIZ/MAYNARD, 2023 W 1472582, at *5 (S.D. Fla. Jan. 18, 2023) (granting motion to dismiss complaint for violation of the FDCPA for lack of subject matter jurisdiction), *R&R adopted*, 2023 WL 1466815 (S.D. Fla. Feb. 2, 2023). A plaintiff simply cannot rely on his "feelings of distress, confusion or anxiety to fabricate concrete injury" because "[s]uch conjectural harms 'cannot satisfy Article III.'" *Preisler*, 2021 WL 2110794 at *5.

### *Fear of a Hypothetical Future Injury and Hiring a Lawyer*

Plaintiff alleges that on September 11, 2024, he feared the "collection tactics would only escalate," so he hired an attorney. [DE 13 ¶ 25, 127].[2] A "hypothetical, future injury," however, is "not an injury in fact." *Crowder v. Andreu, Palma, Lavin & Solis, PLLC*, No. 2:19-cv-820-SPC-NPM, 2021 WL 1338767, at *5 (M.D. Fla. 2021) ("allegations of *possible* future injury are not sufficient") (quoting *Clapper v. Amnesty Inten. USA*, 568 U.S. 398, 409 (2013)). "Where a 'hypothetical future harm' is not 'certainly impending,' plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves." *Crowder*, 2021 WL 1338767 at *6. Plaintiff cannot decide to fear a hypothetical future event and then claim his own decision caused an injury.

Additionally, hiring a lawyer is not a "legally cognizable harm[]." *Pierre v. Midland Credit Mgmt., Inc.*, 29 F. 4th 934, 939 (7th Cir. 2022). *See also Van Vleck v. Leikin, Ingber, & Winters, P.C.*, No. 22-1859, 2023 WL 3123696, at *7 (6th Cir. April 27, 2023) ("The hiring of counsel did not 'flow' from [violation of the FDCPA], but rather defense of the lawsuit and owing of the

---

[2]     This allegation contradicts Plaintiff's earlier allegation that he consulted with his attorney after receiving the 445 and 643 Bills, dated August 22 and 23, 2024. [DE 13 ¶¶ 19-22].

debt."). Similarly, Plaintiff's hiring of counsel flows from his refusal to pay his out-of-pocket expenses, not from receiving mail.

### Time and Money

Plaintiff alleges that after receiving the 445 and 643 Bills, he spent approximately five (5) hours, valued at $200, researching "information about his rights and balancing-billing [sic]." [DE 13 ¶ 23]. He alleges the Second and Third 643 and 445 Letters each caused him, identically, "to waste at least eight (8) minutes," valued at $5 (totaling $20), doing something he fails to identify, [*id.* ¶¶ 99, 106, 118, 124], and caused him to waste 15 minutes, valued at $10 (totaling $40), "preparing and providing" the letters to his attorney [*id.* ¶¶ 100, 107, 119, 125]. He also alleges he spent 2 hours (totaling $80) "to address the issue with his attorney." [*Id.* 22].

First, five (5) hours of self-imposed anticipatory research on a potential future injury, after refusing to contact his Insurer for an explanation of the out-of-pocket expenses, as repeatedly instructed, is not a concrete injury. Second, spending eight (8) minutes on each of four (4) letters doing *something* is not a concrete injury. Third, in the digital age of emails and instant communications, it is not plausible that Plaintiff spent two (2) hours forwarding four (4) letters to the attorney he hired to sue PBCA and Baptist. However, even if he did, time spent providing documents to a lawyer to prepare a lawsuit is not a "legally cognizable harm[]."*Pierre*, 29 F. 4th at 939 ("the concreteness requirement would be an empty one if all it took was contacting a lawyer and filing suit."). A plaintiff "'cannot manufacture standing merely by inflicting harm on [himself]' … including by 'bringing suit for the cost of bringing suit[.]'" *Heres v. Medicredit, Inc.*, No. 23-cv-24815-BLOOM/Torres, 2024 WL 3291738, at *4 (S.D. Fla. July 3, 2024).

*Loss of Sleep*

Plaintiff alleges that after he received the Third 445 and 643 Letters, he "began struggling to sleep due to stress and anxiety, believing that [KCBS] was going to employ more invasive and aggressive collection methods - - regardless of legally [sic]" and that the Second 445 and 643 Letters caused him to lose "more than (2) hours of sleep on at least seven (7) occasions." [DE 13 ¶¶ 127, 129]. Plaintiff's alleged lost sleep is not a result of receiving mail but, rather, is the result of his choice to attempt to avoid paying his out-of-pocket expenses. *See, e.g., Carlisi v. Sprintcom, Inc.*, No. 06-60751-CIV-DIMITROULEAS, 2006 WL 8432613, at *1 (S.D. Fla. Sept. 6, 2006) (dismissing claim which plaintiff alleged resulted in her suffering "anxiety, fear, mental anguish, and loss of sleep and concentration" based on the "long-standing rule that a suit brought under federal law cannot be maintained seeking damages for mental anguish and emotional damages alone"). Without a concrete injury, Plaintiff is left with non-actionable letters. "No concrete harm, no standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021).

## B.     Intrusion Upon Seclusion is not a Valid Common Law Analogue

To determine whether intangible harm is concrete, courts must determine whether there is a close historical or common-law analogue for the asserted intangible injury:

> When considering whether an alleged intangible harm is concrete, or "real," we look to see if it matches up with a harm "traditionally recognized as providing a basis for lawsuits in American courts." *TranUnion*, 141 S. Ct. at 2204. *Spokeo* offered, and *TransUnion* affirmed, a "simple instruction" about how to do so: "see if a new harm is similar to an old harm." *Muransky*, 979 F. 3d at 931. Although an "exact duplicate" of a traditionally recognized harm is not required, the new allegations cannot be missing an element "essential to liability" under the comparator tort. *TransUnion*, 141 S. Ct. at 2209 (quotation omitted).

*Hunstein v. Preferred Collection and Mgmt. Servs., Inc.*, 48 F. 4th 1236, 1242 (11th Cir. 2022). Plaintiff alleges that the mail sent by PBCA and Baptist constituted an intrusion upon his seclusion "by intentionally invading his privacy and disrupting his peace of mind with unwanted and

prohibited debt collection attempts." [DE 13 ¶ 128]. Comparing Plaintiff's alleged harm with the harm caused by intrusion upon seclusion reveals why it fails as an adequate historical analog.

"An intrusion claim has three elements. First, there must be a private quarter. Second, there must be some physical or electronic intrusion into that private quarter. Third, the intrusion must be highly offensive to a reasonable person." *Celestine v. Cap. One*, No. 17-20237-Civ-Scola, 2017 WL 2838185, at *3 (S.D. Fla. June 30, 2017). With respect to the third element, offensiveness:

> The intrusion must also be highly offensive to the reasonable person. … This requires a plaintiff to show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." … The conduct must be viewed objectively. … Whether the alleged conduct satisfies this high standard is a legal question "for the court to decide as a matter of law." …

*N.A.S. v. Morada-Haute Furniture Boutique LLC*, No. 20-24676-Civ-GAYLES/TORRES, 2021 WL 7368588, at *4 (S.D. Fla. Dec. 20, 2021) (citations omitted). "A person's 'subjective reaction' has no bearing on this analysis. ... the plaintiff must demonstrate 'as objectively as is possible, that the alleged misconduct is 'atrocious, and utterly intolerable in a civilized community' ... This is an 'onerous standard'" *Rebalko v. City of Coral Springs*, 552 F. Supp. 3d 1285, 1333 (S.D. Fla. 2020) (citations omitted) (granting motion to dismiss for failing to demonstrate that the alleged intrusion was "so 'objectively ... atrocious' as to deserve the opprobrium of a 'civilized community.'"). "Florida law equates the 'highly offensive to a reasonable person' element from the intrusion-upon-seclusion cause of action with the 'outrageousness' element of the intentional-infliction-of-emotional-distress cause of action." *Hammer v. Sorensen*, 824 F. App'x 689, 696 (11th Cir. 2020).

Plaintiff's receipt of nine letters in the mail regarding two unpaid accounts, after being repeatedly informed that his Insurer determined the out-of-pocket expense, is not outrageous, atrocious, and utterly intolerable in a civilized community. As the Seventh Circuit has explained:

> Text messages may create an injury because they can disrupt a person anytime, anywhere, thereby invading "private solitude." … "[t]he undesired buzzing of a cell phone from a text message, like the unwanted ringing of a phone from a call, is an intrusion into peace and quiet in a realm that is private and personal." … In contrast, postal mail is delivered to a mailbox without interrupting the recipient's seclusion. Mail can be picked up when, if, and how often the recipient chooses, unlike a phone which is usually on one's person or close by throughout the day. While receiving a letter can be an irritation, we do not see an actionable analogy between a letter delivered to a mailbox and automated text messages delivered to one's cell phone.

*Pucillo*, 66 F. 4th at 641. And as this Court has explained: "the *Trichell* Court found congressional judgment also undermined plaintiffs' purported standing because the 'serious harms' the FDCPA is intended to target 'are a far cry from whatever injury one may suffer from receiving in the mail a misleading communication that fails to mislead.'" *Preisler*, 2021 WL 2110794, at * 4. Plaintiff does not have standing, and the Amended Complaint properly should be dismissed with prejudice.

## III.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM

The above analysis should end the inquiry and result in dismissal of the Amended Complaint. Nevertheless, the Court may address other bases for dismissal. *Silver Crown Invest., LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316, 1334 (S.D. Fla. 2018). Dismissal also is appropriate because Plaintiff has failed to state any cognizable claim.

### A.    Violation of 15 U.S.C. § 1692c(a)(2) against PBCA (Count 1)

Plaintiff alleges PBCA violated 15 U.S.C. 1692c(a)(2), which prohibits communication with a consumer "if the debt collector knows the consumer is represented by an attorney with respect to such debt," when it sent the Second and Third 643 and 445 Letters because PBCA learned Plaintiff hired a lawyer when Baptist transferred the accounts to PBCA. [DE 13 ¶ 132, 133]. The allegations fail to state a claim.

The October Dispute Notice only pertains to the 445 account, not the 643 account. [DE 13-4]. Plaintiff alleges his lawyer sent Baptist the October Dispute Notice via certified mail and "[d]ue to a regional weather delay, USPS was delayed in delivering the October Notice until

11

approximately October 31, 2024." [DE 13 ¶¶ 26-27]. Plaintiff offers no explanation of (a) how he knows there was an alleged weather delay or (b) that the letter was delivered at all. In the original Complaint, Plaintiff attached the envelope for the October Dispute Notice which identifies a USPS tracking number. [DE 1-7]. However, Plaintiff, curiously, fails to attach the envelope with the tracking number to the Amended Complaint. [DE 13-4].[3] The purposefully eliminated envelope with the certified mail tracking number leads to the USPS Tracking History of the alleged mailed item. That Tracking History reveals that the item originated in Rochester, New York, on October 9, 2024; there was a regional weather delay; it arrived in Tallahassee, on October 19; there was another regional weather delay; it arrived in Miami on November 4; and, as of November 8, it was "Arriving Late." That is the last update in the Tracking History. (A copy of the USPS Tracking History is attached as **<u>Exhibit 1</u>**).[4] The Tracking History provides no evidence that the letter ever was delivered. Accordingly, when Baptist transferred the 445 account to PBCA, Baptist did not, and could not, inform PBCA that Plaintiff was represented by counsel as it never received counsel's letter. The envelope with the tracking number controls over Plaintiff's bare conclusion that Baptist knew Plaintiff was represented by counsel. [DE 13 ¶¶ 26-27]. *See Gill*, 941 F. 3d at 514.

Plaintiff also fails to attach the envelope with the tracking number for the December Dispute Notice, which he attached as an exhibit to the Original Complaint. [DE 1-10]. The USPS Tracking History for the second purposefully eliminated envelope provides no evidence that the

---

[3]     When resolving a motion to dismiss "a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F. 4th 1292, 1300 (11th Cir. 2024).

[4]     Baptist requests that the Court take judicial notice of the USPS Tracking History pursuant to Fed. R. Evid. 201. *See, e.g., Jackson v. First Nat'l Bank of Omaha*, No. CV 20-1295 DSF, 2022 WL 423440, *2 n.2 (C.D. Cal. Jan. 18, 2022) (granting the plaintiff's request for judicial notice of USPS Tracking Results and Tracking History).

December Dispute Notice ever was delivered to PBCA. Rather, the Tracking History states that the item is "Pre-Shipment, USPS waiting Item." (A copy of the USPS Tracking History is attached as **<u>Exhibit 2</u>**).[5] Count 1 fails and should be dismissed with prejudice because Plaintiff cannot plead around the fact that the USPS Tracking Histories contradict his unsubstantiated allegations.

### B.      Violation of 15 U.S.C. § 1692g(b) against PBCA (Count 2)

Plaintiff alleges PBCA violated 15 U.S.C. § 1692g(b), which states that "[a]ny collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt …" because it shortened the length of the validation period in the First 445 and 643 Letters. [DE 13 ¶¶ 136, 138]. Plaintiff relies on 12 C.F.R. § 1006.34(b)(5) and (c)(3), to conclude that the "end date" of a validation period is 30 days after the "validation information" is received by the consumer, who is assumed to have received it at least five days after it is provided. [*Id.* ¶¶ 137, 138]. Plaintiff concludes the First 445 and 643 Letters shortened the validation period by failing to exclude weekends in the addition of five (5) days to the validation period. [*Id.* ¶¶ 137, 138]. Plaintiff is wrong for several reasons.

First, Section 1692g(b) states, in relevant part:

> *If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a)* that the debt, … is disputed, … the debt collector shall cease collection of the debt, … until the debt collector obtains verification of the debt … and a copy of such verification … is mailed to the consumer by the debt collector.

15 U.S.C. § 1692g(b) (emphasis added). Section 1692(a) provides: "Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice" containing specific information.

---

[5]      *Id.*

The First 445 and 643 Letters are both dated October 14, 2024. [DE 13 ¶¶ 40, 68; 13-5; 13-6]. Plaintiff never mailed any notification to PBCA, only to its fictitious name, KCBS. Even if PBCA received the December Dispute Notice, of which there is no evidence, it was not mailed "within the thirty-day period" as required by section 1692g. It is dated December 5, 2024, which is 52 days after PBCA's initial communication was sent to Plaintiff. [*Id*. ¶ 111; 13-9].

Second, PBCA's initial communications, the First 445 and 643 Letters, both contain all the requisite information required by the statute, including the "end date," which is identified as November 18, 2024. [DE 13-4; 13-5]. November 18 is 35 days after October 14. Section 1692g(a) does not include an additional 5 days for calculation of the "end date." The First 445 and 643 Letters are both fully compliant with 15 U.S.C. § 1692g(b).

Third, the Court cannot apply 12 C.F.R. § 1006.34 to modify the meaning of 15 U.S.C. § 1692g(b). The Eleventh Circuit's canons of statutory construction are controlling:

> "The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute. If the statute's meaning is plain and unambiguous, there is no need for further inquiry." … It is a "fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." …

*Thorne v. Accounts Receivable Mgmt., Inc.*, 282 F.R.D. 684, 692 (S.D. Fla. 2012) (citations omitted). 15 U.S.C. § 1692g(b) plainly states that the consumer has 30 days - - not 30 days plus 5 days (excluding weekends) - - to dispute a debt.

Fourth, the deference to agency interpretations of statutes established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) has been overruled:

> This Court embraced the Framers' understanding of the judicial function early on. In the foundational decision of *Marbury v. Madison*, Chief Justice Marshall famously declared that "[i]t is emphatically the province and duty of the judicial department to say what the law is." 1 Cranch 137, 177, 2 L.Ed. 60 (1803). And in the following decades, the Court understood "interpret[ing] the laws, in the last resort," to be a "solemn duty" of the Judiciary. *United States v. Dickson*, 15 Pet. 141, 162, 10 L.Ed. 689 (1841) (Story, J., for the

Court). When the meaning of a statute was at issue, the judicial role was to "interpret the act of Congress, in order to ascertain the rights of the parties." *Decatur v. Paulding*, 14 Pet. 497, 515, 10 L.Ed. 559 (1840).

*Loper v. Bright Enterprises, v. Raimondo*, 603 U.S. 369, 385, 393 (2024) ("questions of law are for courts *rather than agencies* to decide in the last analysis.") (emphasis in original). This Court, in applying the *Loper* decision to a FDCPA claim, stated: "While the CFPB interpretation may have some appeal (on policy grounds), I am neither bound by it nor required to defer to it … 'It is emphatically the province and duty of the judicial department to say what the law is.'" *Quinn-Davis v. TrueAccord Corp.*, No. 1:23-cv-23590-LEIBOWITZ/REID, 2024 WL 4851344, at * (S.D. Fla. Nov. 20, 2024). Count 2 fails as a matter of law and must be dismissed with prejudice.

**C.    Violation of 12 C.F.R. § 1006.34(c)(2)(iii) and 15 U.S.C. §§ 1692e, 1692f, and 1692g against PBCA (Count 3)**

Plaintiff alleges PBCA violated 12 C.F.R. § 1006.34(c)(2)(iii), which requires a debt collector to disclose "[t]he amount of the debt on the itemization date" in the initial communication's validation information, when it failed to disclose the amount of Plaintiff's unpaid out-of-pocket expenses on any permissible itemization date in the First 643 and 445 Letters, which, in turn, violated 15 U.S.C. § 1692e, 1692f and 1692g. [DE 13 ¶¶ 141-152]. Plaintiff is wrong.

12 C.F.R. § 1006.34(d) contains a model validation notice (the "Model Form") and a safe harbor provision to incentivize the use of the Model Form or a substantially similar form:

> (d) Form of validation information --
> …
>     (2) Safe harbor --
>     (i) In general. Model Form B–1 in appendix B to this part contains the validation information required by paragraph (c) of this section and certain optional disclosures permitted by paragraph (d)(3) of this section. ***A debt collector who uses Model Form B–1 complies with the information and form requirements of paragraphs (c) and (d)(1) of this section***, ...

112 U.S.C. 1006.34(d)(2) (emphasis added). "[S]ection 1006.34(d)(2) makes clear that the Model Form only establishes that Defendant 'complie[d] with the information and form requirements of [section 1006.34].'" *Roger v. GC Servs. Ltd. P'ship*, 655 F. Supp. 3d 1201, 1208 (S.D. Fla. 2023).

The First 643 and First 445 Letters [DE 13-5; 13-6] are <u>identical</u> to the Model Form and are, thus, compliant with the requirements of section 1006.34. (A copy of the Model Form is attached hereto as **Exhibit 3**). Plaintiff fails to state a claim for violation of 12 C.F.R. § 1006.34(c). And because PBCA did not violate §1006.34(c), it did not violate §§ 1692e, 1692f or 1692g. Nevertheless, the First 643 and First 445 Letters also and independently do not violate the FDCPA. Plaintiff alleges PCBA violated 15 U.S.C. §§ 1692e (prohibiting "[t]he false representation of the character, amount, or legal status of any debt"), 1692f (prohibiting "unfair or unconscionable means" to attempt to collect a debt"), and 1692g (setting forth the validation requirements) by "failing to provide the amount of the debt it sought to collect from Plaintiff." [DE 13 ¶¶ 149, 150, 151]. These allegations are demonstrably false, as the First 643 and 445 Letters both identify the amount of the debt. [DE 13-5; 13-6]. PBCA did not violate 12 C.F.R. § 1006.34(c)(2)(iii) or 15 U.S.C. §§ 1692e, 1692f or 1692g and Count 3 properly should be dismissed with prejudice.

**D.    Violation of 15 U.S.C. § 1692e(2)(A) against PBCA (Count 4); and Violation of Fla. Stat. 559.72(9) against Baptist (Count 8)**

In Count 4, Plaintiff alleges PBCA violated 15 U.S.C. § 1692e(2)(A), which prohibits [t]he false representation of ... the character, amount, or legal status of any debt" when it sought to collect from Plaintiff "debts that had already been paid" or that did "not equal the amounts demanded" in the First, Second and Third 445 and 643 Letters. [DE 13 ¶¶ 155, 156].

In Count 8, Plaintiff alleges Baptist violated Fla. Stat. § 559.72(9), which prohibits a person from attempting to "enforce a debt when such person knows that the debt is not legitimate," when

Baptist knew that Plaintiff's Insurer paid the full amount of the charges yet sent mail to Plaintiff directly and sent mail through PBCA. [DE 13 ¶ 173-174].

The first letter Plaintiff received regarding the 445 Bill was from Baptist, dated August 22, 2024, and it stated that Plaintiff's Insurer paid $297.20 and the $445.80 balance was Plaintiff's out-of-pocket expense. [DE 13-1]. The first letter Plaintiff received regarding the 643 Bill was from Baptist, dated August 23, 2024, and it stated that Plaintiff's Insurer paid $428.80 and the $643.20 balance was Plaintiff's out-of-pocket expense. [DE 13-2]. Both letters also stated, in a green highlighted box: "Your insurance carrier has informed us that the balance due is your responsibility … If you have any questions about your out-of-pocket expense, please contact your insurance provider so they can explain how your claim was processed. Your insurance provider determines benefit coverage, and any patient responsibility." [DE 13-1; 13-2].

It is thus indisputable that, before Plaintiff received the First, Second and Third 445 and 643 Letters from PBCA, Baptist already had informed Plaintiff that his Insurer - - not Baptist - - had determined that Plaintiff owed an out-of-pocket expense on each account. Plaintiff fails to allege *why* he believed his Insurer paid the medical bills in full. He fails to allege that he ever contacted his Insurer to inquire whether it paid the full amount. Instead, he took no action and sued in an attempt to be awarded $2,000 and have his out-of-pocket expenses waived.

### E.      Violation of 15 U.S.C. § 1692e(8) against PBCA (Count 5)

Plaintiff alleges PBCA violated 15 U.S.C. § 1692e(8), which prohibits communicating "***credit information*** which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed" (emphasis added) by failing to disclose that Plaintiff disputed the debt in the Second and Third 445 and 643 Letters. [DE 13 ¶ 160]. Plaintiff's reading of § 1692e(8) is without support and is inconsistent with the plain language of the statute.

17

If a debt collector elects to report to a credit reporting agency ("CRA"), Section 1692e(8) imposes a duty on that a debt collector to disclose to that CRA that a debt is disputed:

> the relevance of the portion of § 1692e(8) on which [plaintiff] relies—"including the failure to communicate that a disputed debt is disputed"—is rooted in the basic fraud law principle that, if a debt collector elects to communicate "credit information" about a consumer, it must not omit a piece of information that is always material, namely, that the consumer has disputed a particular debt.

*Llewellyn v. Allstate Home Loans, Inc.*, 711 F. 3d 1173, 1189 (10th Cir. 2013) (citation omitted). "'If a debt collector knows that a debt is disputed by the consumer ... *and reports it to a credit bureau*, he must report it as diputed [sic].'" (*Id.* at 1189) (citation omitted) (emphasis in original). *See also Robinson v. Works & Lentz Inc.*, No. CIV-21-390-G, 2022 WL 4725680, at *2 (W.D. Okla. Sept. 30, 2022) ("[w]hile § 1692e(8) expressly clarifies that 'the failure to communicate that a disputed debt is disputed' is an example of false credit information, that failure must occur in the course of a communication of credit information in order to be actionable."); *Korman v. Gray*, No. 13-80031-CV-MARRA, 2018 WL 11424199, at *11 (S.D. Fla. Aug. 28, 2018) (dismissing 1692e(8) claim because the plaintiff did not allege that the debt collector had not reported the debt to a CRA after the plaintiff's dispute).

Here, the Amended Complaint contains no allegation that PBCA reported Plaintiff's unpaid out-of-pocket expenses to any CRA. Count 5 fails as a matter of law and must be dismissed.

### F. Violation of Fla. Stat. § 559.72(18) against Baptist Health (Count 7)

Plaintiff alleges Baptist hired PBCA "to collect, or attempt to collect, the debts from Plaintiff" and that PBCA, on behalf of Baptist, sent the Letters to Plaintiff. [DE 13 ¶¶ 28-30, 40, 68, 97, 104, 114, 118, 120, 124, 160]. Plaintiff concludes that the Letters were "communication[s] from Baptist Hospital, by and through [PBCA]." [*Id.* ¶¶ 53, 81, 101, 108, 116, 121]. Plaintiff alleges Baptist violated Fla. Stat. § 559.72(18) because PBCA knew Plaintiff hired a lawyer, but

sent the First, Second and Third 643 and 445 Letters anyway. [DE 13 ¶ 170]. Plaintiff, however, fails to allege any facts explaining the relationship between the two separate entities.

As this Court has explained, "A parent company can be held liable for the acts of its subsidiaries in three ways: '(1) an alter ego theory to 'pierce the corporate veil;' (2) vicarious liability based on general agency principles; or (3) direct liability where the parent directly participated in the wrong complained of.'" *Alvarez Galvez v. Fanjul Corp.*, 533 F. Supp. 3d 1268, 1284-85 (S.D. Fla. 2021) (Ruiz, J.) (citation omitted). Plaintiff did not assert a claim to pierce the corporate veil, or allege that Baptist controls or dominates PBCA, to establish direct liability.

With respect to vicarious liability, Plaintiff has not alleged any facts to establish liability based on general agency principles. Pursuant to Florida law:

> to hold a parent liable as the principal of a subsidiary-agent, Plaintiffs must establish: "(1) acknowledgement by the principal that the agent will act for it, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." … The parent corporation "must exercise control to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." … Similarly, under federal common law, the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.

*Galvez*, 533 F. Supp. 3d at 1284-85 (citations omitted). The Amended Complaint is "devoid of allegations that would support these elements of acknowledgement, acceptance, or control." *See Galvez*, at 1285. There are no allegations that Baptist directs PBCA on what to do in its daily activities and when, where and how it shall be done; or that Baptist has the ability to hire, fire or supervise PBCA employees. Baptist is a Florida Not-for-Profit corporation and PBCA is a Florida profit corporation. [DE 15]. They are two distinct corporations, and Plaintiff has alleged no facts that Baptist is vicariously liable for PBCA's actions.

19

Plaintiff also fails to allege an apparent agency relationship between PBCA and Baptist. Apparent authority is:

> authority which a principal knowingly tolerates or permits, or which the principal by its actions or words holds the agent out as possessing." ... "An apparent agency exists only if all three of the following elements are present: (a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation."... "Apparent authority does not arise from the subjective understanding of the person dealing with the purported agent or from appearances created by the purported agent himself." ... "Rather, apparent authority exists only where the principal creates the appearance of an agency relationship." ...

*Mesa v. Am. Express Educ. Assurance Co.*, No.: 16-CV-24447-HUCK, 2017 WL 2210271, at *3 (S.D. Fla. May 18, 2017) (citing *Roessler v. Novak*, 858 So. 2d 1158, 1161 (Fla. 2d DCA 2003)). "While the question of whether an agency relationship exists is a factual question, it is proper for a district court to assess the sufficiency of the factual allegations at the motion to dismiss stage." *SR20 Holdings, LLC v. Old Rep. Aerospace, Inc*., No. 20-CV-61337-RAR, 2020 WL 6470637, at *1 (S.D. Fla. Sept. 22, 2020) (citing *Fojtasek v. NCL*, 613 F. Supp. 2d 1351, 1357 (S.D. Fla. 2009)).

The Amended Complaint contains no allegations that Baptist made any representation to Plaintiff that PBCA was acting as its purported agent, or that Plaintiff relied on or changed his position in reliance on any representation from Baptist. It is clear from the allegations that Plaintiff never relied on any statement, as he never made any payment. Count 7 fails to state a plausible claim for violation of 559.72(18), Fla. Stat. against Baptist and properly should be dismissed.

WHEREFORE, for the foregoing reasons, Defendants Baptist Health South Florida Inc. and Palm Beach Credit Adjustors, Inc. d/b/a Kendall Credit and Business Service, Inc., respectfully request that the Court (1) dismiss the Amended Complaint [DE 13] with prejudice; (2) award Defendants their attorneys' fees and costs to the fullest extent permitted by law (including, but not limited to, under the FDCPA (15 U.S.C. § 1692k) and FCCPA (Fla. Stat. § 559.77(2))); and (3) grant such further relief as the Court deems just and appropriate under the circumstances.

Respectfully submitted,

ISICOFF RAGATZ
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Tel.: (305) 373-3232
Fax: (305) 373-3233

By: /s/ Catherine A. Mancing
      Eric D. Isicoff
      Florida Bar No. 372201
      Isicoff@irlaw.com
      Catherine A. Mancing
      Florida Bar No. 23765
      Mancing@irlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I **HEREBY CERTIFY** that a true and correct copy of the foregoing was served via

CM/ECF on this 23d day of April 2025 upon the following:

Thomas Patti, Esq.
Victor Zabaleta, Esq.
Patti Zabaleta Law Group
110 SE 6th Street, 17th Floor
Fort Lauderdale, FL 33301
Tel.: (561) 542-8550
E-mail: Tom@pzlg.legal
E-mail: Victor@pzlg.legal

By: /s/ Catherine A. Mancing
      Catherine A. Mancing